FUJIWARA AND ROSENBAUM, LLLC

ELIZABETH JUBIN FUJIWARA 3558
JOSEPH T. ROSENBAUM 9205
745 Fort Street, Suite 1501
Honolulu, Hawaii 96813
Telephone: 203-5436

Attorneys for Plaintiff
KANDICE L.K. KAGAWA



1ST CIRCUIT COURT
STATE OF HAWAII
FILED

2011 JAN -4 PM 2: 24

A. MARPLE
CLERK

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAII

| | |
|---|---|
| KANDICE L.K. KAGAWA, | ) CIVIL NO. 11-1-0012-01  . RAN |
| | ) (Other Civil Action) |
| Plaintiff, | ) |
| | ) |
| vs. | ) COMPLAINT; DEMAND FOR JURY |
| | ) TRIAL; SUMMONS |
| | ) |
| FIRST HAWAIIAN BANK/BANCWEST | ) |
| CORPORATION, as a domestic profit | ) |
| corporation; VIVIAN ADAMS, in her official | ) |
| capacity as Senior Vice President, Human | ) |
| Resources Division, for FIRST HAWAIIAN | ) |
| BANK.; BARBARA NITTA, in her official | ) |
| capacity as Vice President, Human Resources | ) |
| Division, for FIRST HAWAIIAN BANK.; | ) |
| ELIZA YOUNG, in her official capacity as | ) |
| Manager of the Credit Services Center, for | ) |
| FIRST HAWAIIAN BANK.; JOHN DOES 1- | ) |
| 10; JANE DOES 1-10; DOE | ) |
| CORPORATIONS 1-10; | ) |
| DOE PARTNERSHIPS 1-10; DOE | ) |
| UNINCORPORATED ORGANIZATIONS | ) |
| 1-10; and DOE GOVERNMENTAL | ) |
| AGENCIES 1-10, | ) |
| | ) |
| Defendants. | ) |
| | ) |

I do hereby certify that this is a full, true and
correct copy of the original on file in this office.

Clerk, Circuit            First Circuit

**EXHIBIT _A_**

<u>COMPLAINT</u>

COMES NOW Plaintiff KANDICE L.K. KAGAWA [hereinafter referred to as "MS. KAGAWA"], by and through her counsel, ELIZABETH JUBIN FUJIWARA and JOSEPH T. ROSENBAUM, and complains against the above-named Defendants alleges and avers as follows:

## I. NATURE OF CASE

1.      The basis of this case is disability/religion/age/sex discrimination involving MS. KAGAWA's employment at FIRST HAWAIIAN BANK.

## II. JURISDICTION

2.      MS. KAGAWA brings this action pursuant, including but not limited to, 29 U.S.C. §§ 621, *et seq,* 42 U.S.C. §§ 2000e, *et seq.* and 42 U.S.C. §§ 12101, *et seq.,* to obtain full and complete relief and to redress the discrimination, as well as tortious conduct described herein.

3.      At all times relevant herein, MS. KAGAWA was an employee of FIRST HAWAIIAN BANK. and a resident of the City and County of Honolulu, State of Hawaii.

4.      At all times relevant herein, Defendant FIRST HAWAIIAN BANK. [hereinafter referred to as " FHB" or "Bank"] is a domestic profit corporation.

      a.      FHB is an employer engaged in industry and affecting commerce and employing more than 15 employees within the meaning of 42 U.S.C. § 2000e(b).

      b.      FHB is also an employer employing more than 20 persons within the meaning of 29 U.S.C. § 623(b).

      c.      FHB was an employer with the definition of § 101(5) of the

Americans with Disabilities of 1990 as amended [42 U.S.C. § 12111(5)].

5.    At all times relevant herein, Defendant FHB's principal place of business is in the City and County of Honolulu, State of Hawaii.

6.    Upon information and belief, Defendant VIVIAN ADAMS at all times relevant herein, was and is a resident of the City and County of Honolulu, State of Hawaii as well as an employee, agent and/or representative of Defendant FHB. She is sued in her official capacity.

7.    Upon information and belief, Defendant BARBARA NITTA at all times relevant herein, was and is a resident of the City and County of Honolulu, State of Hawaii as well as an employee, agent and/or representative of Defendant FHB. She is sued in her official capacity.

8.    Upon information and belief, Defendant ELIZA YOUNG at all times relevant herein, was and is a resident of the City and County of Honolulu, State of Hawaii as well as an employee, agent and/or representative of Defendant FHB. She is sued in her official capacity.

9.    Upon information and belief, and at all times relevant herein, Defendant FHB and FHB's employees, agents and/or representatives, including but not limited to Defendants VIVIAN ADAMS, BARBARA NITTA and ELIZA YOUNG were acting within the course and scope of their duties as employees, agents and/or representatives of Defendant FHB; therefore Defendant FHB is liable for the negligent and/or tortious and/or wrongful conduct of said employees, agents and/or representatives pursuant to the doctrine of Respondeat Superior and/or principles of Agency.

10.    Defendants JOHN DOES 1-100, JANE DOES 1-100, DOE

CORPORATIONS 1-10, DOE PARTNERSHIPS 1-10, DOE UNINCORPORATED

ORGANIZATIONS 1-10, and DOE GOVERNMENTAL AGENCIES 1-10 are sued herein

under fictitious names because their true names, identities and capacities are unknown to the

PLAINTIFF, except that they are connected in some manner with DEFENDANTS, and are/were

agents, servants, employees, employers, representatives, co-venturers, associates, or independent

contractors of DEFENDANTS herein, and were acting with the permission and consent and

within the course and scope of said agency and employment and/or were in some manner

presently unknown to the PLAINTIFF engaged in the activities alleged herein and/or were in

some way responsible for the injuries or damages to the PLAINTIFF, which activities were a

proximate cause of said injuries or damages to the PLAINTIFF.  PLAINTIFF has made good

faith and diligent efforts to identify said DEFENDANTS, including interviewing individuals

with knowledge of the claims herein. At such time as their true names and identities become

known, the PLAINTIFF will amend Complaint accordingly.

11.    All Defendants will be collectively referred to as "DEFENDANTS".

12.    All events done by DEFENDANTS described herein occurred within the

City and County of Honolulu, State of Hawaii, and within the jurisdiction and venue of the

Circuit Court of the First Circuit, State of Hawaii.

13.    The administrative prerequisites for filing the discrimination claims have

been complied with, specifically claims for religious/age/sex/disability discrimination were filed

with the Equal Employment Opportunity Commission on December 10, 2009 [ EEOC Charge

No. 486-2010-00107].  A notice of right to sue was issued by the EEOC on October 6, 2010.

This civil complaint is filed within 90 days of Plaintiff's receipt of her EEOC right to sue notice.

-4-

## III.   STATEMENT OF FACTS

14.   MS. KAGAWA was hired by FHB on May 31, 1989 and, since 2002, she has been a Senior Credit Analyst in the Credit Services Center Department.

      a.  MS. KAGAWA was an "employee" of the Bank within the definition of §101 (4) of the Americans with Disabilities Act of 1990 as amended [42 U.S.C. § 12111(4)] and a "qualified individual with a disability and/ or perceived disability.

15.   MS. KAGAWA is a 45 year old devout Christian, whose devotion to the Christian faith was/is widely known to management and her co-workers at the Bank.

16.   MS. KAGAWA is a mystic in that MS. KAGAWA hears God speaking to her directly.

17.   An example of MS. KAGAWA mysticism is that MS. KAGAWA was once told by God that there was going to be a fire alarm that will sound at 10 a.m. and so she told her co-workers this prior to 10 a.m. and sure enough at 10 a.m. the fire alarm sounded.

18.   In the late 1990's MS. KAGAWA along with fellow Bank employee Carol Yokota started a prayer group that would meet during their lunch breaks from their work at the Bank. This prayer group last for approximately three (3) years. At least one Bank officer, Marilyn Kunitake, attended MS. KAGAWA's prayer group.

19.   MS. KAGAWA's prayer group would meet in the Bank's conference rooms and invite other Bank employees to join them for a time of bible study, worship, praise and prayer.

20. According to MS. KAGAWA, her prayer group sought to help other voluntary members of the group navigate through life's challenges and help them be more productive and happier at work with God's help.

21. During the prayer group years MS. KAGAWA would use the Bank's email system to contact fellow Bank employees and inform them of the existence of these prayer meetings and invite any employees that would like to attend.

22. Any individual that was on the FHB email list reported MS. KAGAWA and her group to the Bank's Human Resources office and MS. KAGAWA was confronted by her then manager Kathryn Okazaki and supervisor at the time, Eliza Young. Ms. Okazaki and Ms. Young told MS. KAGAWA that she couldn't use the Bank's email system for this purpose, so MS. KAGAWA complied and discontinued sending out a mass email notice of their meetings to employees at the Bank using the Bank's email system.

23. Initially MS. KAGAWA's prayer group was meeting in the Bank's conference rooms, but they were reported, in or about 1997, to the Bank's Human Resources department for using the conference rooms for this purpose. Vivian Adams and Barbara Nitta, apparently pursuant to the instructions of the former head of the Bank's Human Resource department, Sheila Sumida, would personally or via the telephone confront MS. KAGAWA and/or Carol Yokota and tell them that they could not use the conference rooms for these prayer meetings. No formal counseling or written notification was ever given to MS. KAGAWA stating the reason that they could not use the conference rooms during their breaks for this purpose.

24. MS. KAGAWA'S prayer group with the support of the Senior Vice President of the Bank, Corbett Kalama, began to hold their meetings in the large conference room on the sixth floor at FHB. However, during the same time, an attorney in the FHB building

-6-

requested to use the large conference room on the sixth floor for his prayer group and approached the bank for authorization.

25.     Soon thereafter the Bank's Human Resources department changed there policy regarding the use of conference rooms. The new Bank policy stated that all users of conference rooms must reserve the rooms online and state the purpose of their meetings. MS. ~~KAGAWA~~ believes this was done to monitor her group's activities and to deter them from convening their prayer group during employee break times.

26.     After moving their group three times to offsite locations, MS. KAGAWA'S prayer group began to meet in, attorney and Damon Estate trustee, Paul Mullin Ganley's office, in the FHB building to pray for anyone's needs and to pray for the bank.

27.     Members of MS. KAGAWA's prayer group would thus come to the Bank to attend meetings in Paul Mullin Ganley's office.

28.     On several occasions members of MS. KAGAWA's prayer group, many of whom were not FHB employees and were FHB patrons, were harassed or intimidated by the Bank. For example, one of the members of MS. KAGAWA's prayer group was told that she couldn't use the public telephone at the FHB building.

29.     On several occasions, current FHB CEO Don Horner would see MS. KAGAWA and he would ask her, "Hey buddy, where are you guys meeting now?" This question reaffirmed that Bank's management knew that MS. KAGAWA was still leading her prayer group.

30.     Additionally, MS. KAGAWA would often work late and would see Don Horner after banking hours and he would ask MS. KAGAWA to pray for him and would even pray over him in the lobby of the Bank or nearby the elevators.

31.     On other occasions Don Horner would ask MS. KAGAWA to pray for him and the organization because the bank was facing tough times.

32.     During the 2002- 2003 years, MS. KAGAWA was accused by the Bank of "converting" people to Christianity.

33.     MS. KAGAWA was, at the time, the President of the Toastmasters group that met in a conference room at the FHB building.

34.     The head of the Bank's Human Resources department, Sheila Sumida, called MS. KAGAWA and asked her what she was seeking to accomplish as the President of the Toastmasters, because MS. KAGAWA would begin the meetings with a prayer. MS. KAGAWA told Ms. Sumida that it was her prerogative as the president of the group.

35.     Fellow FHB employee Nelson Nakagawa, who also attended the Toastmaster meetings, reported MS. KAGAWA to the Bank's Human Resources department because MS. KAGAWA began the Toastmaster's meetings with a prayer which he objected to.

36.     In 2005, MS. KAGAWA met with manager Kathryn Okazaki and supervisor Eliza Young, at the request of Ms. Okazaki and Young, to discuss the instance of a prayer group member that got upset with a Bank security guard because the security guard made an affront to the prayer group member. This incident occurred off of the FHB premises.

37.     At this meeting Kathryn Okazaki and Eliza Young commanded MS. KAGAWA to discontinue any associations she has with several members of her prayer group. MS. KAGAWA informed Ms. Okazaki and Ms. Young that she would not be controlled by the Bank in regards to what she does on her breaks and who she associates with during non-work hours.

38.     At this meeting Kathryn Okazaki informed MS. KAGAWA that Ms. Okazaki was just the bearer of this message from those in the Human Resources department and that Ms. Okazaki felt that MS. KAGAWA was doing a great deal of good for those in her prayer group, but Human Resources asked Ms. Okazaki to tell Ms. KAGAWA this message, so that is what Ms. Okazaki had to do.

39.     On several occasions during MS. KAGAWA's tenure at the Bank she was told that there "is a separation of church and state" and that she should not discuss or talk about God in the workplace. Eliza Young, a Buddhist based upon information and belief, and Alice Herring, a Presbyterian based on information and belief, would also touch on this restriction with MS. KAGAWA on a few occasions.

40.     In or about 2007, FHB CEO Don Horner allowed bible studies to be held in the FHB's conference rooms on a regular basis.

41.     In January 2008, Landon Santos, MS. KAGAWA's assistant in the vehicle industry team, was having a meeting with the vehicle industry team's three bosses. At this time MS. KAGAWA believes that God alerted her that she should relinquish her title as the head of the vehicle industry team.

42.     After said meeting, Mr. Santos asked MS. KAGAWA if she wanted to go have a soda with him. MS. KAGAWA accepted the invitation and before Mr. Santos began to talk to MS. KAGAWA, MS. KAGAWA recited a prayer.

43.     Mr. Santos then proceeded to tell MS. KAGAWA that management wanted Mr. Santos to be the head of the vehicle industry team.

44.     A few days later Ms. KAGAWA's managers spoke to MS. KAGAWA, a Senior Analyst and a longtime FHB employee of 19 years, and told her that they wanted Mr. Santos, a much younger and less experienced employee, to head the vehicle industry team.

45.     On March 9, 2009, <u>after work and off of work premises</u>, MS. KAGAWA approached FHB employee Barry Asato at approximately 6 p.m. at the Beretania Street and the Bishop/Alakea Street bus stop.

46.     MS. KAGAWA informed Barry Asato that she had a dream in which God spoke to her regarding Mr. Asato. MS. KAGAWA told Barry Asato that in her dream God had told her that Barry Asato had feelings/love for her. MS. KAGAWA then thanked Barry Asato for listening, gave him a light hug and shook his hand. Barry Asato then responded, "Take care of yourself" before MS. KAGAWA turned and went on her way.

47.     On March 10, 2009 at 11 a.m., MS. KAGAWA was asked by her immediate supervisor, Rosemaire Cantoria, to meet that afternoon.

48.     During the meeting Ms. Cantoria informed MS. KAGAWA that Barry Asato had come to her and told her that he was offended and felt sexually harassed by what MS. KAGAWA had shared with him at the bus stop the previous day. Because this incident was very personal to MS. KAGAWA, when manager Eliza Young asked her if she had anything to say MS. KAGAWA responded that she had nothing to say other than that she told Barry Asato that she had had a dream and that was all she wanted to say. MS. KAGAWA then expressed to Ms. Cantoria that she was sorry that Barry Asato had taken her comments that way and that she meant no harm. Ms. Young told Ms. Cantoria in front of MS. KAGAWA that she would tell Barry Asato not to take this issue up with the Human Resources department.

49.     MS. KAGAWA then told Ms. Cantoria and Ms. Young that she wanted to personally apologize to Barry Asato and take him for coffee and that she wanted Ms. Cantoria to join. Ms. Cantoria told MS. KAGAWA that now was not the time to apologize, but to do it over time. Ms. Cantoria also told MS. KAGAWA that that if she had anything that she wanted to share that they [FHB management] would always make time to listen to her about anything.

50.     MS. KAGAWA felt that no real closure of the issue with Barry Asato was accomplished as she had no opportunity to explain to him her intentions in telling him about her dream.

51.     On March 11, 2009, because MS. KAGAWA's supervisors had told her that anytime she wanted to discuss anything they would be there to listen, MS. KAGAWA proceeded to call both of her superiors, Ms. Cantoria and Ms. Young, into a conference room at the Bank. MS. KAGAWA then went and got Barry Asato to join the two supervisors in the conference room.

52.     MS. KAGAWA opened the meeting by telling her supervisors and Barry Asato that they had all heard Barry Asato's side of the story and that she wanted to share her side of the story.

53.     MS. KAGAWA then began to gently tell her side of the story. After about eight to ten (8-10) minutes MS. KAGAWA was rudely interrupted by Ms. Young who said, "Kandi, I don't know where you are going, but I don't really want to listen to all of this and I don't think what you are sharing is relevant.." MS. KAGAWA's supervisor, Ms. Cantoria, acknowledged that she agreed with MS. KAGAWA's manager. MS. KAGAWA then got upset because she had been told the previous day that management was willing to listen to her when

she wanted to talk about anything that was troubling her and now she was being silenced by the same members of management.

54.     Ms. Young and Ms. Cantoria then asked Barry Asato if he was comfortable with this. Barry Asato responded, "I really don't want to be here and really don't care what Kandi has to say and I don't know where all of this is leading." The manager then told Barry Asato that he could leave.

55.     At this point, out of frustration MS. KAGAWA stood up and said, "Wait a minute here. Can I have some respect? I called this meeting to share my side of the story. I have listened to you and no one should leave this room until I share what I have to share."

56.     MS. KAGAWA spoke out firmly because she wanted to clear up any misunderstanding between Barry Asato and herself, but she was rudely interrupted by her manager.

57.     MS. KAGAWA felt that she was being judged guilty without being able to provide evidence of her innocence and intentions.

58.     After MS. KAGAWA completed sharing her side of the story, Ms. Cantoria and Ms. Young asked Barry Asato if he was, "alright with all of this?" Barry Asato replied, "Everything is now on the table, I now know that I am candidate two and I'm ok with that." Barry Asato then asked to be excused and he left.

59.     After Barry Asato left the room, Eliza Young asked MS. KAGAWA whether MS. KAGAWA was going to listen to God's instructions or whether she was going to listen to management. MS. KAGAWA replied that she would listen to God in this instance because she needed to fight for her rights. MS. KAGAWA added that she is normally an

obedient worker and would work even harder now that her side of the story was out in the open and thanked Eliza Young.

60.    On March 12, 2009, Ms. Cantoria told MS. KAGAWA that her manager, Eliza Young, wanted to meet with her at 9 a.m. The meeting started at 9:30 a.m. and MS. KAGAWA's manager began by telling MS. KAGAWA that she was not allowed to have any contact with Barry Asato. MS. KAGAWA replied that that was fine with her because everything was now out in the open and she had nothing left to say to Barry Asato.

61.    MS. KAGAWA was then informed that she was being formally counseled. MS. KAGAWA was then informed that her actions during the meeting of March 11, 2009 were threatening to Ms. Cantoria and Ms. Young and that she was being referred to the Employee Assistance Program [hereinafter referred to as "EAP"] for counseling.

62.    Eliza Young then told MS. KAGAWA that she was not to mention "God/The Lord" in their staff meetings.

63.    MS. KAGAWA then asked Ms. Young about the other employees who discuss films and football games during the staff meetings and whether it was alright for them to discuss these non-religious topics.

64.    MS. KAGAWA's manager responded by telling MS. KAGAWA to "just use your discretion and don't talk for fifteen (15) or longer about religious topics."

65.    Ms. Young then informed MS. KAGAWA that if she did not go to counseling within ten (10) days she would be terminated from her position at the Bank.

66.    MS. KAGAWA was then provided with her formal counseling sheet and was told to make any comments that she would like and that it had to be done by the following day, March 13, 2009.

67.    MS. KAGAWA then explained that she felt this whole issue was personal and that it shouldn't have gone this far.

68.    On March 12, 2009 at about 2:20 p.m., Ms. Cantoria came down to MS. KAGAWA's cubicle and informed her that Human Resources would like to meet with her.

69.    Present at the meeting were two of Human Resource's people whom MS. KAGAWA has known for many years, Vivian Adams and Barbara Nitta. Ms. Adams was the lead and Ms. Nitta appears to have been the witness. Ms. Adams proceeded to ask MS. KAGAWA what had happened and MS. KAGAWA chose not to tell them at this point because she knew everything would not be justly taken after how she had previously been dealt with by both her manager and supervisor

70.    MS. KAGAWA also didn't explain what had happened to Ms. Adams and Ms. Nitta because of the personal nature of the incident between her and Barry Asato.

71.    Ms. Adams and Ms. Nitta then asked MS. KAGAWA if she knew why they had called her in. MS. KAGAWA replied, "Yes."

72.    Ms. Adams then took out the general harassment and discrimination policies and honed in on the sexual harassment section and told MS. KAGAWA to read it, which she did.

73.    Ms. Adams and Ms. Nitta then reminded MS. KAGAWA that she was to make an appointment with the employee counseling services which would be paid for by the bank.

74.    Ms. Adams then expressed that she hoped that next time they talked MS. KAGAWA would have more to share with them. Ms. Adams then asked MS. KAGAWA if she

-14-

was afraid to lose her job. MS. KAGAWA replied, " No", because MS. KAGAWA knew she didn't do anything that warranted termination.

75.    Ms. Adams then looked at MS. KAGAWA and said, "Kandi, I want you to go back upstairs and I want you to gather your belongings and I want you to go home. As of this moment, you are on administrative leave. You do have vacation, right?" And MS. KAGAWA said, "Yes." Ms. Adams then told MS. KAGAWA that she would be home but would be getting paid." Ms. Adams then looked at Ms. Nitta and Ms. Nitta said, "I think Kandi has vacation." Ms. Nitta sounding like she was  not sure about this and looked like she was caught off guard on this decision to send MS. KAGAWA home or that she knew about it but didn't check if MS. KAGAWA had vacation or not.

76.    At this point, MS. KAGAWA was also advised to not step on the bank's property or come into the office for any reason as further investigation and documentation had to be done by the bank before they could get back to MS. KAGAWA and tell her what the next step would be.

77.    MS. KAGAWA then said, "Okay." Ms. Adams then told Ms. Nitta that she should escort MS. KAGAWA up to her department, but Ms. Nitta didn't think that was a good idea. After hesitating awhile, Ms. Adams said, "Okay...I'll come, too." So they all went to MS. KAGAWA's department, passed MS. KAGAWA's desk, and went to the conference room.

78.    Ms. Adams called MS. KAGAWA's manager Eliza Young out of her office to meet with them. Ms. Young in turn called MS. KAGAWA's supervisor Ms. Cantoria. So the 5 of them met in the conference room and Ms. Adams advised Ms. Young that MS. KAGAWA was on administrative leave as of this moment, until Tuesday or so and therefore any

of her work within the next three days would need to be reassigned until Tuesday or Wednesday when Human Resources would call MS. KAGAWA to tell her the outcome of the investigation.

79.     Ms. Adams also told MS. KAGAWA's manager, Eliza Young, that MS. KAGAWA would be using vacation time so that she would get paid.  It then dawned on MS. KAGAWA that because she was going home and couldn't come back whatsoever and that she had promised her manager that she would have her counseling comments ready by 9 a.m. Being that she was now being sent home,   MS. KAGAWA saw the urgency to make the comments on her counseling before she left, but she had not yet read the formal counseling because she thought she would have time. MS. KAGAWA then just blurted out that she didn't have time to do her comments, but at this point she was okay with just signing the document to get it over with without making comments at this time.  So MS. KAGAWA signed the counseling report in the presence of the managers and a copy was made for her, given to her and the meeting adjourned.

80.     MS. KAGAWA then went back to her desk and gave her work to her supervisor and changed her email to say that she will be out of the office.

81.     On March 13, 2009, MS. KAGAWA called the counseling services and set up an appointment with Deborah Rochelle-Williams for March 19, 2009 at 10 a.m.

82.     On March 19, 2009 MS. KAGAWA went to her appointment at the counseling services.

83.     During the session, which lasted for one (1) hour and fifteen (15) minutes, one of the questions asked to MS. KAGAWA twice was, "Are you afraid of losing your job?" In both instances MS. KAGAWA responded, "No, I am not."

84.    Ms. Rochelle-Williams then proceeded to ask MS. KAGAWA, "Do you suppose this was a onetime situation?" MS. KAGAWA replied, "Yes."

85.    Ms. Rochelle-Williams then asked MS. KAGAWA what she does from sunrise to sunset, so MS. KAGAWA told her what her day consists of.

86.    As far as the incident with Barry Asato, Ms. Rochelle-Williams didn't ask MS. KAGAWA how she felt and what were the circumstances that led up to what was interpreted as the "inappropriate behavior". Ms. Rochelle-Williams was privy to the information that was attached to the counseling sheet that was written up by MS. KAGAWA's manager in which both copies were given to her as well as to MS. KAGAWA.

87.    MS. KAGAWA read what was written up by her manager two (2) weeks later. The counseling stated that MS. KAGAWA hears a voice and whatever the voice says she will do. There was no mention in the counseling report that MS. KAGAWA had told management that "the Lord impressed upon her heart" and that she hears God. MS. KAGAWA understood that management was implying that she heard just any voice and that she was some insane person. This upset MS. KAGAWA because her manager didn't clearly state what MS. KAGAWA had said in its entirety. MS. KAGAWA's manager selectively picked only a voice but was not specific in that MS. KAGAWA said that she heard God's voice.

88.    During the session Ms. Rochelle-Williams stated that she may think about referring MS. KAGAWA to a doctor but wasn't sure at this point. She said, if she does, all MS. KAGAWA would have to do is pay the co-payment since insurance would likely cover it. Ms. Rochelle-Williams then said, "You do have insurance right" MS. KAGAWA replied, "Yes, but personally I wouldn't know if such visits would be covered or if whatever services you are asking me to undergo would be covered."

89.    MS. KAGAWA then left the session and checked her voicemail. On her voicemail MS. KAGAWA received a message from Ms. Adams in which Ms. Adams informed MS. KAGAWA that she was sorry, but she just determined that MS. KAGAWA didn't have enough accrued vacation and that she was actually out on administrative leave without pay beginning March 12, 2009.

90.    MS. KAGAWA then received a call from Ms. Rochelle-Williams at the counseling services office. Ms. Rochelle-Williams informed MS. KAGAWA that she wanted her to make an appointment with a doctor for an evaluation. Ms. Rochelle-Williams also asked MS. KAGAWA if she could give the doctor the notes she took during their counseling session. MS. KAGAWA had to think about all of this, so she asked if she could call Ms. Rochelle-Williams back first thing on the morning of March 20, 2009.

91.    On March 20, 2009 at 7:35 a.m. MS. KAGAWA called Ms. Rochelle-Williams and left a message that, being that she was on leave without pay, she will not be willing to pay for the appointment with the doctor and that she didn't want Ms. Rochelle-Williams to share anything that they had discussed with the doctor. MS. KAGAWA left Ms. Rochelle-Williams her cell phone number in case Ms. Rochelle-Williams needed to contact her.

92.    On March 25, 2009, MS. KAGAWA received a call from Ms. Rochelle-Williams that she got MS. KAGAWA's message and that she is not willing to help MS. KAGAWA with telling the Human Resources department at the Bank that MS. KAGAWA couldn't afford to pay for the doctor's appointment. MS. KAGAWA pleaded with her that if she could help MS. KAGAWA talk to the Human Resources people and tell them that MS. KAGAWA did not have the funds, but if they are willing to pay MS. KAGAWA will go. MS. KAGAWA also reaffirmed that she didn't want any information to be shared for confidentiality

purposes and in all fairness to MS. KAGAWA. Ms. Rochelle-Williams said it was not her job and that MS. KAGAWA should take it up with her Human Resources people since MS. KAGAWA was on the inside and she is not. MS. KAGAWA then told Ms. Rochelle-Williams that she is referring MS. KAGAWA and MS. KAGAWA is not getting paid, so if she could please help her. MS. KAGAWA was frustrated that she had to plead with Ms. Rochelle-Williams and upset with how long this was taking. Ms. Rochelle-Williams then told MS. KAGAWA that the Bank's Human Resources might view this as MS. KAGAWA's unwillingness to go to this doctor and MS. KAGAWA told her that MS. KAGAWA didn't say that. Again, MS. KAGAWA told her that she was on leave without pay and that every dollar counts, but Ms. Rochelle-Williams still insisted that it was not her job, yet she was the one referring MS. KAGAWA to go to the doctor. Furthermore, MS. KAGAWA told Ms. Rochelle-Williams that she was being forced to go to see Ms. Rochelle-Williams because MS. KAGAWA was told to. Ms. Rochelle-Williams didn't seem nice anymore because MS. KAGAWA was upset and she didn't like the idea that MS. KAGAWA was asking Ms. Rochelle-Williams to help her and kept insisting that it is Ms. Rochelle-Williams' job to coordinate and not MS. KAGAWA's.

93.     On March 25, 2009 at 10:30 p.m., MS. KAGAWA checked her telephone messages and found out that at or about 12:53 p.m. that afternoon a voicemail from Ms. Adams of Human Resources was left which was telling MS. KAGAWA that Ms. Adams would like to schedule a meeting on March 26, 2009 at 1p.m. to meet with MS. KAGAWA.

94.     On March 26, 2009, MS. KAGAWA left a message on Ms. Adams' phone at or about 6:30 a.m. telling Ms. Adams that MS. KAGAWA would be by at 1p.m. for the meeting and that if Ms. Adams has any questions to call MS. KAGAWA.

95.     On the same day, MS. KAGAWA got a call from Ms. Adams at or about 7:45 a.m. and Ms. Adams told MS. KAGAWA that they are going to have to push the meeting back to 1:30 p.m.

96.     On the same day at approximately 1:35 p.m. MS. KAGAWA's meeting with Ms. Adams, Ms. Nitta and Ms. Young was convened.

97.     Ms. Adams opened up the meeting, looked at MS. KAGAWA and said plainly to her, "In looking at everything and based on a conversation with the counselor (Ms. Rochelle-Williams), we have no choice. As hard as a decision as it was, we are going to have to terminate you." That was literally all that MS. KAGAWA was told and was lightly briefed about COBRA and her retirement accounts.

98.     To date, MS. KAGAWA has never received a formal termination letter stating the reasons that she was terminated.

99.     On May 22, 2009, while conducting bank business at the main branch bank located at 999 Bishop Street, MS. KAGAWA was approached by the head security, John Delima, and another security guard and was asked to be spoken to outside the building. So MS. KAGAWA complied. MS. KAGAWA was then informed by John that, as hard as this was for him and because it was his job, he had to serve MS. KAGAWA a paper telling her that she was not to come on to property for 1 year from this date, otherwise she would be arrested.

100.    On December 10, 2009, MS. KAGAWA duly filed a charge with the Hawaii Civil Rights Commission and the U.S. Equal Employment Opportunity Commission alleging age/sex/disability and religion discrimination, EEOC Charge No. 486-2010-00107. On October 6, 2010, MS. KAGAWA was issued a right to sue notice from the Equal Employment

Opportunity Commission. Therefore, all administrative processes have been exhausted and this complaint is filed within 90 days of the receipt of the notice of the right to sue.

## COUNT I
## DISABILITY DISCRIMINATION

101.     MS. KAGAWA realleges and reincorporates paragraphs 1 through 100 as though fully set forth herein.

102.     The practices and policies described above are part of a pattern and practice of disability discrimination utilized by the DEFENDANTS and constitute a violation of 42 U.S.C.A. § 12112 in that DEFENDANTS discriminated against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employee, employee compensation, job training, and other terms, conditions, and privileges of employment and such acts were interdictions of that statute against hiring, limiting, classifying, segregating, or discharging employees on the basis of disability.

103.     The aforementioned acts and/or conduct of DEFENDANTS entitle MS. KAGAWA to damages as provided by law.  As a direct and proximate result of said unlawful employment practices MS. KAGAWA has suffered extreme mental anguish, outrage, depression, great humiliation, severe anxiety about her future and her ability to support himself, as well as painful embarrassment among her relatives and friends, damage to her good reputation, disruption of her personal life, loss of enjoyment of the ordinary pleasures of everyday life and other general damages in an amount which meets the minimal jurisdictional limits of this Court.

## COUNT II
## RELIGIOUS DISCRIMINATION

104.     MS. KAGAWA realleges and reincorporates paragraphs 1 through 103 as though fully set forth herein.

105. The practices and policies described above are part of a pattern and practice of religious discrimination utilized by the DEFENDANTS and constitute a violation of 42 U.S.C. § 2000e-2(a) and the inter-dictions of that statute against hiring, limiting, classifying, segregating , and/or discharging employees on the basis of religion.

106. The aforementioned acts and/or conduct of DEFENDANTS entitle MS. KAGAWA to damages as provided by law. As a direct and proximate result of said unlawful employment practices MS. KAGAWA has suffered extreme mental anguish, outrage, depression, great humiliation, severe anxiety about her future and her ability to support himself, as well as painful embarrassment among her relatives and friends, damage to her good reputation, disruption of her personal life, loss of enjoyment of the ordinary pleasures of everyday life and other general damages in an amount which meets the minimal jurisdictional limits of this Court.

## COUNT III
## SEX DISCRIMINATION

107. MS. KAGAWA realleges and reincorporates paragraphs 1 through 106 as though fully set forth herein.

108. The practices and policies described above are part of a pattern and practice of sex discrimination utilized by the DEFENDANTS and constitute a violation of 42 U.S.C. § 2000e-2(a) and the inter-dictions of that statute against hiring, limiting, classifying, segregating, and/or discharging employees on the basis of sex.

109. The aforementioned acts and/or conduct of DEFENDANTS entitle MS. KAGAWA to damages as provided by law. As a direct and proximate result of said unlawful employment practices MS. KAGAWA has suffered extreme mental anguish, outrage, depression, great humiliation, severe anxiety about her future and her ability to support himself, as well as painful embarrassment among her relatives and friends, damage to her good reputation,

disruption of her personal life, loss of enjoyment of the ordinary pleasures of everyday life and other general damages in an amount which meets the minimal jurisdictional limits of this Court.

## COUNT IV
## AGE DISCRIMINATION

110.    MS. KAGAWA realleges and reincorporates paragraphs 1 through 109 as though fully set forth herein.

111.    The practices and policies described above are part of a pattern and practice of age discrimination utilized by the DEFENDANTS and constitute a violation of 29 U.S.C. § 621, *et seq*. in that DEFENDANTS discharged any individual or otherwise discriminated against any individual with respect to her compensation, terms, conditions, or privileges of employment, because of such individual's age and limited, segregated, or classified an employee in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect her status as an employee, because of such individual's age.

112.    The aforementioned acts and/or conduct of DEFENDANTS entitle MS. KAGAWA to damages as provided by law.  As a direct and proximate result of said unlawful employment practices MS. KAGAWA has suffered extreme mental anguish, outrage, depression, great humiliation, severe anxiety about her future and her ability to support himself, as well as painful embarrassment among her relatives and friends, damage to her good reputation, disruption of her personal life, loss of enjoyment of the ordinary pleasures of everyday life and other general damages in an amount which meets the minimal jurisdictional limits of this Court.

## COUNT V
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

113.    MS. KAGAWA incorporate paragraphs 1 through 112 as though fully

set forth herein.

114.     DEFENDANTS' treatment of MS. KAGAWA, as aforesaid, constitutes extreme and outrageous behavior which exceeds all bounds usually tolerated by decent society. DEFENDANTS' actions and omissions were done with malice and/or with the intent to cause, and/or with the knowledge that it would cause, severe mental distress to MS. KAGAWA.

115.     As a direct and proximate result of DEFENDANTS' wrongful, unlawful, and illegal acts and/or omissions, MS. KAGAWA suffered and continue to suffer emotional and/or mental distress, thereby entitling her to relief related thereto in an amount to be proven at trial.

## COUNT VI
## PUNITIVE DAMAGES

116.     MS. KAGAWA realleges and incorporates paragraphs 1 through 115 as though fully set forth herein.

117.     DEFENDANTS' treatment of MS. KAGAWA, as aforesaid, constitutes extreme and outrageous behavior which exceeds all bounds usually tolerated by decent society. In committing the above acts and omissions, DEFENDANTS acted wantonly and/or oppressively and/or with such malice as implies a spirit of mischief or criminal indifference to civil obligations and/or there has been some willful misconduct that demonstrates that entire want of care which would raise the presumption of a conscious indifference to consequences, justifying an award of punitive or exemplary damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, MS. KAGAWA respectfully prays that this Court enter judgment granting the following relief on all causes of action:

A.     Declaratory, injunctive, and equitable relief is sought pursuant to 29 U.S.C.

§§ 621, *et seq,* 42 U.S.C. §§ 2000e, *et seq.* and 42 U.S.C. §§ 12101, *et seq.*

B.    That this Court enter a declaratory judgment that DEFENDANTS have violated the rights of MS. KAGAWA;

C.    That this Court issue a mandatory injunction enjoining all DEFENDANTS from exercising the practice or custom of denying, abridging, withholding or conditioning the rights of employees on, *inter alia,* the basis of their disability, religion, age and/or gender status;

D.    That this Court issues an Order directing Defendants to reinstate MS. KAGAWA to her position at FHB (or a comparable position) or, in the alternative, pay for such a position for a reasonable time into the future.

E.    That this Court award MS. KAGAWA special damages for the aforementioned Counts including but not limited to back pay, reimbursement for lost pension, Social Security, experience training and all employee benefits that would have been enjoyed by her, assessed jointly and severally against all DEFENDANTS, together with interest on said amounts, in amounts which shall be shown at trial;

F.    That this Court award MS. KAGAWA compensatory damages, proximately caused by DEFENDANTS' tortious and abusive conduct, including, but not limited to, general damages for negligent and/or intentional infliction of mental or emotional distress, assessed against all DEFENDANTS pursuant to 29 U.S.C. §§ 216 and 217 and other applicable statutes, together with interest on said amounts, all in an amount to be proven at trial;

G.    That this Court award MS. KAGAWA exemplary or punitive damages, pursuant to 29 U.S.C. §§ 621, *et seq,* 42 U.S.C. §§ 2000e, *et seq.* and 42 U.S.C. §§ 12101, *et seq.*, in an amount to be proven at trial;

H.    That this Court directs DEFENDANTS to pay MS. KAGAWA an

additional amount as liquidated damages as provided for in Section 7(b) of the ADEA, 29 U.S.C. § 626 (b) and other applicable statutes;

I.    That this Court award MS. KAGAWA reasonable attorney's fees and costs of suit herein as well as prejudgment and post-judgment interest as provided by state law and federal law, *e.g.*, as provided by 29 U.S.C. § 216(b) and § 706(k) of Title VII, 42 U.S.C. § 12205 and Section 7(b) of the ADEA, 29 U.S.C. § 626(b);

J.    That this Court retain jurisdiction over this action until the DEFENDANTS have fully complied with the Orders of this Court and that this Court require the DEFENDANTS to file such reports as may be necessary to secure compliance;

K.    That this Court award MS. KAGAWA such other and further relief both legal and equitable as this Court deems just, necessary and proper under the circumstances..

DATED:  Honolulu, Hawaii, January 7, 2011.

ELIZABETH JUBIN FUJIWARA
JOSEPH T. ROSENBAUM
Attorneys for Plaintiff
KANDICE L.K. KAGAWA

# IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

## STATE OF HAWAII

KANDICE L.K. KAGAWA,

        Plaintiff,

        vs.

FIRST HAWAIIAN BANK/BANCWEST
CORPORATION,  as a domestic profit
corporation; VIVIAN ADAMS, in her official
capacity as Senior Vice President, Human
Resources Division, for FIRST HAWAIIAN
BANK.; BARBARA NITTA, in her official
capacity as Vice President, Human Resources
Division,  for FIRST HAWAIIAN BANK.;
ELIZA YOUNG, in her official capacity as
Manager of the Credit Services Center, for
FIRST HAWAIIAN BANK.; JOHN DOES 1-
10; JANE DOES 1-10; DOE
CORPORATIONS 1-10;
DOE PARTNERSHIPS 1-10; DOE
UNINCORPORATED ORGANIZATIONS
1-10; and DOE GOVERNMENTAL
AGENCIES 1-10,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CIVIL NO. _____
(Other Civil Action)

DEMAND FOR JURY TRIAL

## DEMAND FOR JURY TRIAL

Pursuant to Hawaii Rules of Civil Procedure, Rule 38, Plaintiff hereby demands
trial by jury on all issues so triable herein.

DATED:      Honolulu, Hawaii, January 4, 20__

                                 ELIZABETH JUBIN FUJIWARA
                                 JOSEPH T. ROSENBAUM
                                 Attorneys for Plaintiff
                                 KANDICE L.K. KAGAWA

## IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

### STATE OF HAWAII

| | |
|---|---|
| KANDICE L.K. KAGAWA,<br><br>Plaintiff,<br><br>vs.<br><br>FIRST HAWAIIAN BANK/BANCWEST CORPORATION, as a domestic profit corporation; VIVIAN ADAMS, in her official capacity as Senior Vice President, Human Resources Division, for FIRST HAWAIIAN BANK.; BARBARA NITTA, in her official capacity as Vice President, Human Resources Division, for FIRST HAWAIIAN BANK.; ELIZA YOUNG, in her official capacity as Manager of the Credit Services Center, for FIRST HAWAIIAN BANK.; JOHN DOES 1-10; JANE DOES 1-10; DOE CORPORATIONS 1-10; DOE PARTNERSHIPS 1-10; DOE UNINCORPORATED ORGANIZATIONS 1-10; and DOE GOVERNMENTAL AGENCIES 1-10,<br><br>Defendants. | ) CIVIL NO. _____<br>) (Other Civil Action)<br>)<br>) SUMMONS<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### SUMMONS

STATE OF HAWAII:

To the above-named Defendants:

You are hereby summoned and required to serve FUJIWARA AND ROSENBAUM, LLLC,, whose address is 745 Fort Street, Suite 1501, Honolulu, Hawaii 96813, an answer to the Complaint herewith served upon you, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default

will be taken against you for the relief demanded in the Complaint.

This summons shall not be personally delivered between 10:00 p.m. and 6:00 a.m. on premises not open to the general public, unless a judge of the above-entitled court permits, in writing on this summons, personal delivery during those hours.

A failure to obey this summons may result in an entry of default and default judgment against the disobeying person or party.

DATED:     Honolulu, Hawaii, _____ JAN - 4 2011 _____.

A. MARPLE ( SEAL )

CLERK OF THE ABOVE-ENTITLED COURT



In accordance with the Americans with Disabilities Act, and other applicable state and federal laws, if you require a reasonable accommodation for a disability, please contact the ADA Coordinator at the First Circuit Court Administration Office at PHONE NO. 539-4399, OR TTY 539-4853, at least ten (10) working days prior to your hearing or appointment date.

-2-